J-A06044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RAILROAD RECOVERY INC., A PENNSYLVANIA CORPORATION, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| | : | No. 3717 EDA 2015 |
| BRIAN MAST, AND SIXTH STREET MANAGEMENT CORP., A PENNSYLVANIA CORPORATION, AND JOHN GIUNUP, AND MICHAEL PETTACIO | : | |

Appeal from the Judgment Entered November 24, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  03647, July Term 2013

BEFORE:  PANELLA, J., SHOGAN, J., and RANSOM, J.

MEMORANDUM BY RANSOM, J.:                    **FILED JUNE 13, 2017**

Appellant, Railroad Recovery Incorporated, appeals from the judgment entered November 24, 2015,[1] in favor of Brian Mast, Sixth Street Management Corporation, John Giunup, and Michael Pettacio (collectively, "Appellees"), quieting title and granting ejectment over the right-of-way. We affirm.

_____

[1] Appellant purported to appeal from the September 11, 2014 order compelling testimony of the principal of Railroad Recovery Inc. and granting sanctions to Appellee; the October 7, 2014 order denying Appellant's motion for sanctions; and the November 24, 2015 order denying Appellant's motion for post-trial relief and entering judgment.  However, of the aforementioned orders, the instant appeal is only proper in the context of the final order of November 24, 2017.  **See** Pa.R.A.P. 341.

This appeal arises from a dispute over the ownership of a five-block strip of land located between Rockland and Cayuga Streets in the City and County of Philadelphia. The trial court outlined the relevant procedural history as follows:

[Appellant] Railroad Recovery Inc. (["Appellants"]) instituted this action against the [Appellees] on July 26, 2013, seeking an ejectment of the [Appellees] (Counts I & II) from (and a recovery of possession of) the disputed property. [Appellant] also sought injunctive relief (Count II) and to recover mesne profits and rent as a result of its alleged dispossession of the disputed property (Count III).

[During discovery, the trial court compelled the deposition of Appellant's principal, Thomas Clauss by order dated September 11, 2014, and awarded Appellees $350 in sanctions. Appellant filed a motion for sanctions against Appellee, which was denied on October 7, 2014.]

After an extended period of discovery, this matter was scheduled for a non-jury trial between March 11, 2015[,] and March 17, 2015. On March 13, 2015, following the close of [Appellant's] case, the [trial] court granted: (1) the [Appellees'] motion for nonsuit of all counts against [Appellee] Brian Mast in his individual capacity; (2) the [Appellees'] motion for nonsuit to Count III of the [Appellant's] amended complaint, which sought mesne profits and rents; and (3) [Appellees] John Giunup's and Michael Pettacio's (collectively "Pettacio [Appellees]") motion to amend their counterclaims to assert a claim for adverse possession for the "Payload Property," an area within the disputed property.

On July 20, 2015, [the trial court] found in favor of the [Appellees] and quieted title of the disputed property in favor of the [Appellees]. On November 24, 2015, [the trial court] heard oral argument on the [Appellant's] motions for post-trial relief, which were denied that same day.

Trial Court Opinion, 5/16/2016, at 1-2 (unnecessary capitalization omitted).

In November 2015, Appellant timely filed a notice of appeal and filed a court-ordered 1925(b) statement raising twenty-five issues. The trial court filed a thoroughly responsive opinion in May 2016.

On appeal, the Appellant raises the following fifteen issues for our review:

1. Is Appellant the real party in interest?

2. Did the trial court lack subject matter jurisdiction to quiet title in Appellees, who failed to bring the real party in interest onto the record?

3. Is Poor Boys' prior judgment binding on Appellant?

4. Did the 1854 Dickenson Deed convey fee simple subject to condition subsequent?

5. Did the possibility of reversion terminate?

6. Is the 1862 trustee deed [] the common source?

7. Did Appellees prove intent to warrant title?

8. Did Appellees prove intent to convey an easement?

9. Did Appellees prove an easement?

10. Does common carrier obligation affect property ownership?

11. Is an express easement distinguished by nonuse?

12. Are Appellees' counterclaims time barred?

13. Was it error to allow oral amendments at trial?

14. Did Appellant establish a clear right to relief?

15. Was it an abuse of discretion to award sanctions without a prior order?

Appellant's Brief at 4-5 (some formatting added).

"In reviewing the ruling of the trial court in an action to quiet title, an appellate court's review is limited to determining whether the findings of fact are supported by competent evidence, whether an error of law has been committed, and whether there has been a manifest abuse of discretion." **Vernon Twp. Volunteer Fire Dep't, Inc. v. Connor**, 855 A.2d 873, 879 (Pa. 2004) (citing **Moore v. Duran**, 687 A.2d 822, 827 (Pa. Super. 1996), *petition for allowance of appeal denied*, 700 A.2d 442 (Pa. 1997)).

An appellate court will "respect the trial court's findings with regard to credibility and weight of the evidence unless it can be shown that the lower court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." **Gemini Equip. Co. v. Pennsy Supply, Inc.**, 595 A.2d 1211, 1215 (Pa. Super. 1991).

On appeal, Appellant raises fifteen issues for our review. We have reviewed the certified record, the briefs of the parties, the applicable law, and the well-reasoned opinion authored by the Honorable Denis P. Cohen of the Court of Common Pleas of Philadelphia County, filed May 16, 2016. We conclude that Judge Cohen's comprehensive opinion is dispositive of the issues presented in this appeal. Accordingly, we adopt the opinion as our own for purposes of further appellate review and affirm the judgment on that basis.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/13/2017

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Railroad Recovery Inc., | : | July Term 2013 |
| Plaintiff | : | |
| v. | : | No. 130703647 |
| Brian Mast, Sixth Street Management Corp., John Giunup, and Michael Pettacio | : | |
| Defendants | : | |

## OPINION

### A. PROCEDURAL HISTORY

Plaintiff Railroad Recovery Inc. ("Plaintiff") instituted this action against the Defendants

on July 26, 2013, seeking an ejectment of the Defendants (Counts I & II) from (and a recovery of)

possession of) the disputed property. Plaintiff also sought injunctive relief (Count II) and to

recover mesne profits and rent as a result of its alleged dispossession of the disputed property

(Count III).

After an extended period of discovery, this matter was scheduled for a non-jury trial

between March 11, 2015 and March 17, 2015. On March 13, 2015, following the close of

Plaintiff's case, the Court granted: (1) the Defendants' Motion for Nonsuit of all counts against

Defendant Brian Mast in his individual capacity; (2) the Defendants' Motion for Nonsuit to

Count III of the Plaintiff's Amended Complaint, which sought mesne profits and rents; and (3)

Defendants John Giunup's and Michael Pettacio's (collectively "Pettacio Defendants") motion to

amend their counterclaims to assert a claim for adverse possession for the "Payload Property," an

area within the disputed property.

Railroad Recovery, Inc. Vs Mast Etal-OPFLD

13070364700161

On July 20, 2015, this Court found in favor of the Defendants and quieted title of the disputed property in favor of the Defendants. On November 24, 2015, this Court heard oral argument on the Plaintiff's Motions for Post-Trial Relief, which were denied that same day.

On November 29, 2015, Appellant filed his Notice of Appeal. On December 22, 2015, Appellant filed a Statement of Matters, alleging the following errors on appeal:

1. The 9/11/2014 order by Judge Sarmina was abusive as there was no prior order compelling depositions and defendants gave one days notice of deposition.
2. Judge Fox allowed discovery court to be intentionally misled where an action for mesne profits is intended to disgorge defendants of their ill-gotten profits (good faith damages) or ill-gotten income (bad faith damages), so that the 10/7/2014 order should have enforced the prior orders for discovery.
3. Under the pronouncements of Supreme Court as of 1854 and currently, a recorded indenture in fee simple subject to a condition subsequent is not an easement, and Judge Cohen's finding of an easement is merely a cover-up for the decision of another court involving other parties, where that court held a deed existed but could not be located for the purposes of trial.
4. Without citation to authority, the trial court holding it lacked subject matter jurisdiction to decide an action in ejectment for land in Philadelphia County is erroneous.
5. Without citation to authority, the trial court disregarded precedent holding the purpose of an ejectment action is opposed to determine the immediate rights between plaintiff and defendant involved in that litigation. Sabella v. Appalachian Development Corp., 2014 PA Super. 237, 103 A.3d 83 (2014).
6. The 1854 Dickinson Deed conveyed a fee simple subject to a condition subsequent, as it provides for a possibility of a reverter; and uses the classic language of that period for such a conveyance. John Bouvier's Law Dictionary, 1856 Ed.
7. The findings and conclusions of the trial court confirm all of the referenced indicia of a deed in fee simple subject to a condition subsequent are present; that is: the presence of a habendum clause ("TO HAVE AND TO HOLD the rights and premises aforesaid unto the said The North Pennsylvania Rail Road Company, their successors and assigns forever, upon condition that the said Company, its successors or assigns, shall make, maintain, keep and use upon the aforesaid piece of land a Rail Road,") which does not conflict with the grant ("the entire and exclusive use, right, liberty and privilege of using and occupying and enjoying for Rail Road purposes") use of present tense of words of conveyance ("doth Grant Bargain Sell Release and Confirm, unto the said The North Pennsylvania Rail Road Company, their successors and assigns"); and consideration paid in the amount of $9,356.67 in 1854 dollars

2

for a 9 acres and 57 perches strip of rail roadbed, which sum was more than the nominal payment of $1 or $300, in the cases relied upon by the court.

8. The 1854 Dickinson Deed used words of a conditional fee (forever, upon condition that the said Company, its successors or assigns, shall make, maintain, keep and use upon the aforesaid piece of land a Rail Road, and if it shall happen that the railroad *** shall be removed or abandoned or the said described piece of land shall cease to be used for Rail road purposes, then the said strip of land shall revest in the said Sally Norris Dickinson, her heirs and assigns, as of her and their first and former Estate, and she or they shall thereupon repossess). Emrick v. Bethlehem Tp., 506 Pa. 372, 375, 485 A.2d 736, 737 (Pa. 1984).

9. The duty of defendants' predecessors in title was to "thereupon (immediately) repossess" any interest they had in the disputed land by legal proceedings, which the predecessors failed to do.

10. Defendants failed to prove Dickinson's last Will devised her remaining interest in the conveyed strip of land to the adjacent owners; contradicting the admission of their expert such proof was necessary to identify the interest of defendants.

11. There is not clear and convincing evidence the drafters of the 1854 Dickinson Deed intended a warranty clause was necessary as the Railroad Law of 1849 allowed the railroad to take land by eminent domain; or that Dickinson intended to warrant she had title to the 9 acres conveyed, of her 221 acres of North Philadelphia, spanning four boroughs, towns and townships, against adverse possessors.

12. There is not clear and convincing evidence the drafters of the 1854 Dickinson Deed intended to create an easement.

13. The findings and conclusions of the trial court confirm all of the referenced indicia of an easement are lacking; that is: recitation of specific right to use land for "using and taking earth, stones, and gravel from the land" (statement of "the entire and exclusive use, right, liberty and privilege of using and occupying and enjoying for Rail Road purposes" is consistent with the stated condition subsequent the failure of which would create a right of reversion, "forever, upon condition that the said Company, its successors or assigns, shall make, maintain, keep and use upon the aforesaid piece of land a Rail Road").

14. In 1984, a .6 mile strip of the former Bethlehem Branch did "cease to be used for railroad purposes" by Conrail's affirmative act of filing "with [the] Interstate Commerce Commission an application that would enable Conrail to abandon its common carrier obligation on a portion of the Bethlehem Branch."

15. The determination of the Interstate Commerce Commission, to allow the railroad to abandon the line, does not affect the underlying property ownership.

16. Mere nonuse by the railroad does not amount to abandonment. To establish abandonment, the evidence must show that the easement holder intended to give up its right to use the easement permanently. No single factor alone is

3

sufficient to establish the intent to abandon. Abandonment must be determined based upon all of the surrounding circumstances. Buffalo Tp. v. Jones, 571 Pa. 637, 646, 813 A.2d 659, 665 (Pa. 2002). The factors relied upon by the trial court were disapproved by the Buffalo Tp. court.

17. Conrail took certain action that suggested an intention to abandon the railroad line, such as filing a request to abandon rail service with the ICC and planning for dismantling of the rails. However, Conrail took other steps evidencing the contrary intent, such as sale of the .6 mile strip of rail roadbed to plaintiff, which demonstrated Conrail's intent to retain dominion over the rail roadbed. Further, Conrail sought to discontinue rail service over only a .6 mile length of the Bethlehem Branch.

18. There is no evidence Conrail undertook external affirmative acts of physical obstruction that carried out its intent to abandon its property interest in the disputed land which rendered the use of the disputed land impossible or created some physical obstruction in a manner that is inconsistent with its further enjoyment. Hence, the rail roadbed has not been abandoned. To the contrary, Conrail did sell the rail roadbed to plaintiff, who demolished the bridge.

19. An easement, created by a deed, cannot be extinguished or affected by nonuse or abandonment for railroad purposes unless it is shown by some positive, adverse, and hostile interference by these defendants, who claim that the easement has been extinguished, or the loss of title in some other way recognized by law. No such situation is present.

20. There is no evidence, when, if at all, subsequent to the January 1988 "Lines Cleared for Dismantling" memorandum [Ex. D29], the .6 strip of rail roadbed sold to plaintiff was dismantled and tracks removed. Predecessor in title, Conrail did not abandon its interest but maintained dominion where it subsequently entered into agreement to sell the rail roadbed in 1990 [Ex. D1B].

21. Defendants, John Giunup and Michael Pettacio did not timely or at all commence an action in ejectment for that portion of the disputed property in possession of plaintiff.

22. Each of the counterclaims by defendants, Sixth Street Management Corp., John Giunup and Michael Pettacio are barred by the statute of limitations.

23. The trial court erred in granting to defendants, John Giunup and Michael Pettacio leave to orally amend their counterclaims on the 3rd day of trial.

24. Trial court, finding plaintiff was not the real party in interest, lacked jurisdiction to quiet title in favor of defendants, who failed to bring real party in interest onto the record.

25. To establish a claim for a permanent injunction, the party must establish his or her clear right to relief. However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or need for immediate relief and a court "may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." Buffalo Tp. v. Jones, 571 Pa. 637, 644, 813 A.2d 659, 663 (Pa. 2002).

4

## B. FACTS

### I. The Parties and the Disputed Property

This dispute arises out of the ownership of a portion of a strip of land that extends across five city blocks from Cayuga Street to Rockland Street in Philadelphia along a former Northern Pennsylvania Railroad roadbed. (Findings of Fact and Conclusions of Law, 2). Defendant Sixth Street Management Corporation ("Defendant Sixth Street") owns property located at 4455 North 6th Street (the "Sixth Street Property"). (N.T. 3/13/15 at 161). Pettacio Defendants own adjacent property at 4525 North 6th Street (the "Payload Property"), on which they operate a waste disposal business called Payload Disposal. Plaintiff is a Pennsylvania corporation formed by Mr. Thomas Clauss. (N.T. 3/17/15 at 37–38). Mr. Clauss is the Plaintiff's president, sole officer, and sole shareholder. (N.T. 03/16/15 at 133–34). Mr. Clauss formed Railroad Recovery to hold to the title to the disputed property in this case. (*Id.* at 134). Plaintiff claims title, by way of chain of title dating back to a January 12, 1854 deed executed by Ms. Sally Norris Dickinson (the "Dickinson Deed"), to a strip of land that now runs through the rear of the Sixth Street Property and the Payload Property. (Findings of Fact and Conclusions of Law, 2–3).

The disputed area within the Sixth Street Property encompasses a total area of 6,703.2 square feet or .1539 acres. (*Id.* at 3). The disputed area within the Sixth Street Property runs through the middle of an existing gravel and dirt area and is partially bordered by: (a) on the southern boundary by an aluminum fence gate, and (b) on the eastern boundary by a chain-link fence and pvc pipe fence. (*Id.*). The disputed area within the Payload Property encompasses a total area of 10,641.7 square feet or .2443 acres. (*Id.*). The disputed area within the Payload Property runs through two existing one story office buildings, one abandoned railway scale station, and existing gravel and paved concrete areas of the Payload Property. (*Id.*).

5

## II.    *The Plaintiff's Asserted Chain of Title*

In 1854, Ms. Dickinson conveyed an interest in her property to the North Pennsylvania

Railroad Company by way of deed in exchange for $9,356.67. (N.T. 3/16/15 at 96). In total, the

Dickinson Deed conveyed 9 acres and 57 perches of land, which is equivalent to 9.35625 acres,

407,558.25 square feet, or approximately .0146 square miles. The Dickinson Deed's *grant*

*clause* describes the strip of land to be conveyed as follows:

> [D]oth Grant Bargain Sell Release and Confirm unto the Said North
> Pennsylvania Rail Road Company their Successors and assigns the Entire and
> Exclusive use Right liberty and privilege of using occupying and Enjoying for
> Rail Road purposes All that Strip or piece of land part of the lands and Estate
> of the Said Sally Norris Dickinson Extending from Nicetown lane to
> Wingohocking Creek in the township of the Northern Liberties and County of
> Philadelphia containing nine acres and fifty Seven perches as the Said Strip or
> piece of land is delineated and laid down in the map or plan thereof here unto
> annexed which is to be taken as part of this indenture and of keeping using
> and maintaining thereon the Rail Road of the Said party . . . .

(Findings of Fact and Conclusions of Law, 4); (Plf. Exhs 1–2); (Def. Exh. 80).

Furthermore, the 1854 Dickinson Deed's *habendum clause* details that North

Pennsylvania Railroad Company, its successors, and assigns had:

> [a]t all times hereafter forever together with the incidents easements and
> appurtenances thereunto belonging To have and to hold the Rights and
> premises aforesaid . . . forever upon condition that that Said Company its
> Successors or Assigns Shall make maintain keep and use upon the aforesaid
> piece of Land a Rail Road and if it Shall happen that the Rail Road
> Contemplated to be now Shortly Constructed on and over the Said Described
> Strip or piece of Land or any Renewals or Reconstructions thereof shall be
> Removed or abandoned or the Said described piece of land Shall cease to be
> used for Rail Road purposes then the Said Strip of land Shall revert in the Said
> Sally Norris Dickinson her heirs and assigns as of her and their first and
> former Estate and She or they shall thereupon Repossess and Enjoy the Same
> as if this Present Indenture had never been made . . . .

(Findings of Fact and Conclusions of Law, 4); (Plf. Exhs 1–2); (Def. Exh 80).

6

By way of deed dated March 29, 1976 and recorded May 11, 1979, the North Pennsylvania Railroad Company conveyed its interest under the Dickinson Deed to Consolidated Rail Corporation ("Conrail"). (Findings of Fact and Conclusions of Law, 4); (Plf. Exhs 3, 10). The conveyance to North Pennsylvania Railroad Company was mandated by an Order of the Special Regional Rail Reorganization Court. (Findings of Fact and Conclusions of Law, 5); (Plf. Exh 10). The Special Court approved the final System Plan of the United States Railway Association and awarded the North Pennsylvania Rail Road Company lands to Conrail. (Findings of Fact and Conclusions of Law, 5); (Plf. Exh 10). In early 1984, the ICC authorized Conrail to abandon the disputed property. (Findings of Fact and Conclusions of Law, 5); (Plf. Exh 14). Conrail effectuated the abandonment of the disputed property by removing the railway, thus relieving itself of any obligations to provide rail services over the disputed property. (Findings of Fact and Conclusions of Law, 6). At the time of its filing for abandonment of the disputed property, Conrail conducted *de minimis* rail business on the property. (*Id.* at 6).

On November 2, 1994, Plaintiff purchased the disputed property from Conrail for $18,000. (N.T. 3/17/15). In conjunction with this purchase, Conrail delivered a quitclaim deed to the Plaintiff, dated November 2, 1994 ("1994 Quitclaim Deed"). (N.T. 3/16/15 at 141). The Plaintiff failed to record the 1994 Quitclaim Deed. (*Id.* at 164). Mr. Clauss's attempt to record the 1994 Quitclaim Deed with Chase Abstract Title Company ("Chase") failed due to the lack of an address or legal description in the deed. (*Id.* at 163–64). Mr. Clauss did not contact Conrail to attempt to correct the recording problem. (*Id.*).

Eighteen years later, on January 25, 2012, Conrail delivered to the Plaintiff, upon the Plaintiff's request, a "Quitclaim Deed of Confirmation" (the "2012 Confirmation Deed"). (Findings of Fact and Conclusions of Law, 7). Conrail was asked to prepare the deed because

7

Plaintiff has entered into a transaction to sell the disputed property to Mr. Linda Miller and the deal was held up because the 1994 Quitclaim Deed was not recorded and, at that point, Plaintiff was unable to locate the 1994 Quitclaim Deed. (*Id.*).

*III.    The Plaintiff's Sale of the Disputed Property to Ms. Miller*

On February 16, 1998, the Plaintiff entered into an agreement to sell, via an installment contract, all of the land it had previously purchased from Conrail to Ms. Linda Miller.[1] (N.T. 3/16/15 at 138–40). Ms. Miller fully performed her purchase obligations under the installment contract in 1999 or 2000. (N.T. 3/16/15 at 138–56); (N.T. 3/17/15 at 38, 41–46, 48). However, no formal closing was ever conducted. (N.T. 3/16/15 at 141). Instead, Plaintiff delivered the 1994 Quitclaim deed received from Conrail to Ms. Miller, in the belief that doing so was sufficient to convey title of the railroad property to Ms. Miller. (*Id.* at 141–46).

Since 2000, Ms. Miller and her husband, Mr. Mike McNally, have had full possession of the property. (*Id.* at 152–53, 162). During that time, Mr. McNally operated a scrap yard on the disputed property and filled the disputed property with auto debris and trash. (N.T. 3/13/15 at 173-74); (N.T. 3/16/15 at 119, 153, 153, 164–64). Plaintiff did not pay taxes on the property at this time, despite receiving a tax bill in 2013. (N.T. 3/16/15 at 150–51).

*IV.    Litigation Following the Plaintiff's Sale of the Disputed Property to Ms. Miller*

In 2008, Defendant Sixth Street filed an action seeking ejectment of Ms. Miller from the Sixth Street Property portion of the disputed property. (Findings of Fact and Conclusions of Law, 9). The Honorable Gary S. Glazer, Judge of the Court of Common Pleas of Philadelphia

---

[1] Per the installment contract, the Plaintiff agreed to sell all of its Conrail railroad property for $20,000, with $10,000 cash owed on the date of execution of the installment contract, and the remaining $10,000 owed via five monthly installments of $2,000 beginning on June 1, 1998. (Findings of Fact and Conclusions of Law, 8). Upon payment by Ms. Miller of the entire $20,000, and upon full compliance with the provisions set forth in the contract, the Plaintiff agreed "(1) to execute and deliver [to Ms. Miller] a deed for [the railroad premises]." (*Id.*).

8

County, conducted a non-jury trial for that case in August of 2009. (*Id.*). Ms. Miller's defense was that the land she purchased via the 1998 installment contract from Plaintiff contained an easement to use Defendant Sixth Street's property. (*Id.*). Judge Glazer found in favor of Defendant Sixth Street, stating specifically in his conclusions of law that Ms. Miller "does not have a right to use the 'alleged easement.'" (Def. Tr. Exh. 19 at 3–4). On October 8, 2009, Judge Glazer further ordered Ms. Miller to "discontinue [her] use of [Defendant Sixth Street's] property and remove all [of her] property from [Defendant Sixth Street's] premises within thirty days." (*Id.* at 1).

In 2011, Ms. Miller sued the Plaintiff in federal and state court because the Plaintiff failed to execute and deliver a deed to her as provided by the 1998 installment contract. (N.T. 3/3/16/15 at 147–48); (N.T. 3/17/15 at 48); (Findings of Fact and Conclusions of Law, 9). Ms. Miller and the Plaintiff settled those cases and thereafter entered into an agreement wherein the Plaintiff promised to prosecute the instant case. (N.T. 3/17/15 at 48).

V.      *Defendants' Asserted Chain of Title to the Sixth Street and Payload Properties*

The Defendants' chain of title begins with an 1862 deed executed by the trustees of Ms. Dickinson to the Defendants' predecessor-in-title, Gustavus G. Logan ("Logan-Dickinson Deed"). (Findings of Fact and Conclusions of Law, 10). The Dickinson-Logan provides that the property extended to the middle line of the North Pennsylvania Rail Road and that the land conveyed "include[es] the portion occupied by the [North Pennsylvania] Rail Road." (Def. Tr. Exhs 76. 86). The deed provided that the conveyed property extended to the "center line" or "middle lime" of the (now former) North Pennsylvania Railroad. (Findings of Fact and Conclusions of Law, 10).

9

Defendant Sixth Street purchased the Sixth Street Property from the estate of Edward Rabon on November 20, 2003 for $25,000. (N.T. 3/13/15 at 161). The deed conveying the Sixth Street Property to Defendant Sixth Street ("Sixth Street Deed") is a warranty deed. (Def. Tr. Exh. 54). The legal description contained in the Sixth Street Deed provides that the property extends from "the southeasterly side of 6th Street . . . from the Southwesterly side of Annsbury Street . . . to a point in the middle line of the North Pennsylvania Railroad." (*Id.*).

The Pettacio Defendants purchased the Payload Property for $180,000 on March 18, 2004 from Luis A. Colon. (Def. Tr. Exh. 45). This deed states that the Payload Property extends from "a point at the intersection of the Southwesterly side of Annsbury Street with the Southeasterly side of 6th Street; thence along the said side of 6th Street South . . . to the center line of the North Pennsylvania Railroad." (*Id.*).

## C. DISCUSSION

*1. Deposition Order*

Plaintiff first alleges that this Court erred by issuing an order compelling the deposition of Thomas Clauss, Jr. after the discovery deadline had elapsed. Specifically, Plaintiff alleges that Plaintiff was given only one day's notice prior to the deposition.

The Pennsylvania Rules of Civil Procedure do not establish a timetable for depositions, as these matters come within the sole discretion of the trial court. *See Wertz v. Kephart*, 542 A.2d 1019, 1021 (Pa. Super. 1988); *Lombardo v. DeMarco*, 50 A.2d 1256, 1259 (Pa. Super. 1985). Furthermore, the Rules do not contain any formal requirements for a time interval between the notice and the scheduled deposition, but merely state that "reasonable notice" must be given to all parties. Pa. R. Civ. P. 4007.1(a). The trial court's discretion to admit or exclude a

10

deposition during trial will not be disturbed absent abuse. *Wertz*, 542 A.2d at 1021; *see Egelkamp v. Egelkamp*, 524 A.2d 501, 504 (Pa. Super. 1987).

In the instant case, the Plaintiff's failure to make Mr. Clauss available for deposition testimony necessitated Judge Sarmina's September 11, 2014 Order compelling the deposition testimony. The Defendants originally notified the Plaintiff of a scheduled deposition for Mr. Clauss, and a corporate designee of the Plaintiff, on August 15, 2014. (Def. Mot. To Compel, 1; Exh. A). The depositions were scheduled for August, 27, 2014 at 10:00 A.M., with a rescheduling date of August 28. On August 26, 2014, the afternoon prior to the deposition, Plaintiff unilaterally cancelled the deposition due to alleged issues with exhibits identified at a prior deposition. (*Id.* at 2). Plaintiff refused to make Mr. Clauss available for deposition for the rescheduling date of August 28, 2014. (*Id.*).

Due to Plaintiff's lack of cooperation in making Mr. Clauss available, the Defendants sought, and obtained, Judge Sarmina's Order to compel the testimony on September 11, 2014. (Ct. Order to Compel 9/11/14). The Order required the deposition to be held sometime between September 15, 2014 and September 17, 2014. (*Id.*).

Plaintiff have failed to allege any prejudice that resulted from the Order that would have made the notice unreasonable. *See* Pa. R. Civ. P. 4007.1(a). Plaintiff had over a week to prepare for the initial deposition of Mr. Clauss scheduled for August 27, 2014. (*See* Def. Mot. To Compel, 1; Exh. A). The Plaintiff's unilateral decision to postpone the deposition, with less than a day prior to the scheduled time, afforded Plaintiff further opportunity to prepare. (*See id.* at 2). Furthermore, Judge Sarmina's Order compelling the deposition set the earliest possible date for said deposition four days away. (*See* Ct. Order to Compel 9/11/14). Thus, from the time Plaintiff was notified of the Defendants' intent to depose Mr. Clauss, to the earliest date set by

11

the Order compelling the deposition, Plaintiff had thirty-one (31) days to prepare for the deposition. Furthermore, the delays and problems with the deposition were created by the Plaintiff and their failure to make Mr. Clauss available at the agreed upon times. Therefore, Plaintiff's argument that Judge Sarmina's Order was an abuse of discretion, and that the notice given to Plaintiff was unreasonable, is without merit.

*II. Discovery Hearing Request Denial*

The trial court's order denying a motion to compel discovery is reviewed under the abuse of discretion standard. *Commonwealth v. Widmer*, 744 a.2D 745, 753 (Pa. 2000). The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. *Id.* Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. *Id.* Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Id.*

Plaintiff claims that this Court erred by denying Plaintiff's request for a discovery hearing regarding the Defendants' alleged failure to produce requested tax returns. While generally broad and liberal discovery is encouraged, the policy favoring generous discovery must be balanced against other public policies. *Hyman Companies, Inc. v. Brozost*, No. CIV. A. 97-269, 1997 WL 535180, at *3 (E.D. Pa. Aug. 8, 1997). For example, public policy considers tax returns as confidential communications between the taxpayer and the government and thus favors their nondisclosure. *Id.* Pennsylvania courts have outlined a two-part test to determine the discoverability of tax returns. *See id.*; *Horwath v. Brownmiller*, 51 Pa. D. & C.4th 33, 42–45

12

(Ct. Com. Pl. 2001). The party seeking discovery must demonstrate: (1) relevance; and (2) a compelling need for such documentation because the information is not available elsewhere. *Horwath*, 51 Pa. D. & C. at 44.

In the instant case, Plaintiffs made no efforts to demonstrate either of the two prongs and therefore were not entitled to court action enforcing discovery requests for tax returns. *See id.* In their request for discovery sanctions, Plaintiff merely stated that, although the documents were brought at a deposition, they were never produced. (Plf. Mot. for Sanctions 9/16/14). Plaintiffs failed to even attempt to demonstrate that they were entitled to the discovery of these sensitive documents and thus this Court did not err in denying their motion. *See Horwath*, 51 Pa. D. & C. at 44.

Furthermore, the Plaintiffs suffered no prejudice from the denial of the motion for sanctions. The Plaintiff alleges in its Statement of Errors that the requested documents would have informed the Plaintiff as to the Defendants' income for the purposes of ascertaining mesne profits. However, given the Court's ruling that the Plaintiff did not have a right to possess the disputed property, the question of mesne profits became unnecessary to address. Thus, any prejudice the Plaintiff may have suffered in relation to discovery related the mesne profits issue was rendered moot by the Court's final ruling.

*III. Subject Matter Jurisdiction*

A. <u>This Court Did Not Err in Concluding That It Lacked Jurisdiction Due to the Plaintiff's</u>
<u>Lack of Standing</u>

This Court did not err in concluding that Plaintiff lacked standing to maintain its actions for ejectment and injunctive relief against the Defendants because the Plaintiff sold and relinquished any interest to the to the disputed property that it may have had to Ms. Miller in

13

2000. Due to the Plaintiff's lack of standing, this Court correctly determined that it did not have jurisdiction to proceed on the merits of this action.

Pennsylvania Rule of Civil Procedure 2002 provides that "[A]ll actions shall be prosecuted by and in the name of the real party in interest, without distinction between contracts under seal and parol contracts."[2] Pennsylvania courts have defined the word "real party in interest" as "the person who has the power to discharge the claim upon which suit is brought and to control the prosecution of the action brought to enforce rights arising under the claims. " *See, e.g., Clark v. Cambria County Bd. Of Assessment Appeals*, 747 A.2d 1242, 1246 n.9 (Pa. Cmnwlth. 2000). A plaintiff who is not the real party in interest has no standing to maintain the action. *Id., citing Sierra Club v. Hartman*, 605 A.2d 309 (Pa. 1992) ("A person cannot invoke the jurisdiction of a court to enforce private rights, or to maintain a civil action for the enforcement of such rights, unless that person has some real interest in the cause of action, or a legal right, title, or interest in the subject matter of the controversy.").

Pennsylvania law provides that an installment sale agreement should be treated as a mortgage. *Stillwater Lakes Civic Assoc. v. Krawitz*, 772 A.2d 118, 121 (Pa. Cmnwlth 2001). The moment an installment sale agreement is executed and delivered, the owner of the land sells his equitable title to the realty to the purchaser. *Id.; Yannopoulos v. Sophos*, 365 A.2d 1312, 1314 (Pa. Super 1976). At that point, "the land so contracted cease[s] to be real estate in [the seller's] hands," *Foster v. Harris*, 10 Pa. 457, 459 (Pa. 1849), and "the seller retains legal title only as a security against the purchase price." *Posel v. Redevelopment Authority of City of Philadelphia*, 456 A.2d 243, 246 n.4 (Pa. Cmnwlth 1983).

---

[2] The rule also provides three exceptions, all of which are inapplicable in the instant case.

14

Legal title—the seller's last remaining interest in the property—is retained by the seller only until the buyer satisfies the terms of the installment contract (*i.e.* until the buyer pays the outstanding balance of the mortgage.). *Stillwater*, 772 A.2d at 121; *Yannopoulos*, 365 A.2d at 1314. Accordingly, under Pennsylvania law, the seller has no interest in the property once the buyer performs her purchase obligations set forth in the installment contract.[3] A transfer of a deed is effective to convey real property so long as (1) the grantor has donative intent and (2) there is an actual or constructive delivery of the deed to the grantee. *Fiore v. Fiore*, 174 A.2d 858, 859 (Pa. 1961).

In the instant case, according to Mr. Enright, Conrail believed that the 1994 Quitclaim Deed effectively conveyed its interest in the disputed property to the Plaintiff. (Enright Tr. at 83). Furthermore, as evidenced by Mr. Clauss's attempt to record the 1994 Quitclaim Deed with Chase, Conrail delivered the 1994 Quitclaim Deed to the Plaintiff in 1994. (N.T. 03/16/15 at 163). As such, it is without doubt that Conrail conveyed its interest in the disputed property to the Plaintiff via the 1994 Quitclaim Deed on November 2, 1994. (Def. Tr. Exh 2).[4]

On February 16, 1998, the Plaintiff entered into an installment contract with Ms. Linda Miller. (Def. Tr. Exh 4). In exchange for the sum of $20,000, the Plaintiff agreed to sell and convey to Ms. Miller "All That Certain premises" "Beginning at approximately Mile Post 4.2, being the southern line of Cayuga Street and extending thence in a general northerly direction to approximately Mile Post 4.8, being the northerly line of Rockland Street." (*Id.* ¶ 1); (Exh. A attached to Def. Tr. Exh 4 ¶ 2). As defined by the installment contract, the land sold was a

---

[3] On the contrary, once the terms of the installment contract are completed, the seller is bound to execute and deliver a deed to the buyer and, in the event of a seller's death before the deed is executed, the seller's heirs are bound to execute and deliver such a deed. *Foster v. Harris*, 10 Pa. 457, 459 (Pa. 1849).

[4] The fact that Mr. Clauss was unable to record the deed does not change this Court's conclusion that Conrail's interest in disputed property was conveyed to the Plaintiff in 1994. *Fiore v. Fiore*, 174 A.2d 858, 859 (Pa. 1961) ("The recording of the deed [is] not essential to its validity or the transition of the title.")

15

"portion of the same premises which the North Pennsylvania Railroad Company . . . issued pursuant to the Regional Rail Reorganization Act of 1973 . . . which Conveyance Document was recorded on May 11, 1979 . . . Document No. D-1948-202." (Exh. A attached to Def. Tr. Exh 4 ¶ 2).

The land identified in the installment contract constituted the sale of *all* of the land which the Plaintiff received via quitclaim deed from Conrail in 1994, including *all of the disputed property at issue in this case.* (Def. Tr. Exhs 2–3). Indeed, both the 1994 Quitclaim Deed and the 2012 Confirmation Deed described that the entirety of the property conveyed by Conrail to the Plaintiff was: "Beginning at approximately Mile Post 4.2, being the southerly line of Cayuga Street and extending thence in a general northerly direction to approximately Mile Post 4.8, being the northerly line of Rockland Street, the place of ending." (Def. Tr. Exh 2 at 2) (2012 Confirmation Deed); (Def. Tr. Exh 3 at 2) (1994 Quitclaim Deed). As described by the 1994 Quitclaim Deed, the land conveyed was "a portion of the same premises which the North Pennsylvania Railroad Company . . . issued pursuant to the Regional Rail Reorganization Act of 1973 . . . which Conveyance document was recorded on May 11, 1979 . . . Document No. D-1948-202." (Def. Tr. Exh 3). Per the terms of the installment contract entered into between the Plaintiff and Ms. Miller, the Plaintiff agreed, upon payment of $20,000 by Ms. Miller, to "execute and deliver to [Ms. Miller] a deed for said premises." (Def. Tr. Exh 4 ¶ (c)).

Additionally, Mr. Clauss, the Plaintiff's president and sole officer/shareholder, admitted, via his deposition and trial testimony: (1) that he entered into an agreement, on behalf of the Plaintiff, to sell the subject property to Ms. Miller in February of 1998, (2) that Ms. Miller fully performed her purchase obligations (including the full payment of $20,000) under the installment contract in 1999 or 2000, (3) that the Plaintiff provided Ms. Miller the Conrail deed (which the

16

Plaintiff received when it purchased the property from Conrail) because he thought such an act sufficiently conveyed the property to Ms. Miller, and (4) that after he sold the property to Ms. Miller, Ms. Miller and her husband Mr. McNally took possession of the property. (N.T. 03/16/15 at 138–156); (N.T. 03/17/15 at 38, 41–46, 48). As such, because Ms. Miller satisfied the terms of the installment contract, since at least 2000, the Plaintiff has had no legal or equitable interest whatsoever in the disputed property and does not have standing to maintain the instant action concerning such property. For these reasons, this Court correctly concluded that the Plaintiff lacked standing to bring these actions and, thus, this Court lacked jurisdiction to address the Plaintiff's claims. *See Clark*, 747 A.2d at 1246 n.9.

B. The Court Did Not Err in Determining the Defendants' Counterclaim to Quiet Title

In a quiet title action, the only relevant inquiry is whether the claimants can establish the right to immediate exclusive possession. *Plauchak v. Boling*, 653 A.2d 671, 675 (Pa. Super. 1995), *citing Doman v. Brogan*, 592 A.2d 104, 108 (Pa. Super. 1991). In an action to quiet title, the claimants "can recover only on the strength of [their] own title and not upon the weakness of the [opposing party's] title. *Plauchack*, 653 A,2d at 675 n.3; *Montrenes v. Montrenes*, 513 A.2d 983, 984 (Pa. Super. 1986).

In the instant case, the Court did not err in rendering a decision in favor of the Defendants in their counterclaim to quiet title because the Defendants proved by a preponderance of the evidence, the boundaries of the land for which they maintained paramount title. *See Plauchak*, 653 A.2d at 675. The Defendants established a clear chain of title dating back to the original Dickinson Deed which provides that the Sixth Street Property and the Payload Property extend to the "middle line" or "center line" of the North Pennsylvania Railroad, including the area occupied by the railroad. (Def. Tr. Exh. 54). The chain of title tracks through Defendant Sixth

17

Street purchasing the Sixth Street Property from the estate of Edward Rabon and the Pettacio Defendants purchasing the Payload Property from Luis A. Colon. (N.T. 3/13/15 at 161)' (Def. Tr. Exh. 45). Moreover, as discussed *infra*, because Conrail extinguished its interest in the disputed property in 1988, the Defendants have shown that they own their respective portions of the disputed property in fee simple. *See Dellach v. DeNinno*, 862 A.2d 117, 118 (Pa. Super. 2004). Finally, the Plaintiff's claim that their own failure to prove standing precludes the Defendants from seeking a counterclaim fails because the Defendants have established their title and thus succeed, regardless of the weaknesses of the Plaintiff's case. *See Plauchack*, 653 A.2d at 675 n.3.

Plaintiff contends that this Court erred by ruling on the Defendants' counterclaims because Ms. Miller was not a party to this action. A party is indispensable only when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights. *See Sprague v. Casey*, 550 A.2d 184, 189 (Pa. 1988). "[I]f, [however], the merits of a case can be determined without prejudice to the rights of the absent party, the court may proceed." *Id.*

In the instant case, The Plaintiff claims that Ms. Miller was an indispensable party to the action due to her claimed interest in the land. However, Ms. Miller did not have a legally cognizable claim to the disputed property. This Court had ruled in a prior case that Ms. Miller did not have a right to use the alleged easement. (Def. Tr. Exh. 19 at 6). Thus, at the time of this trial, Ms. Miller no longer had an interest in the disputed property so as to be considered an indispensable party. *See Sprague v. Casey*, 550 A.2d at 189.

Additionally, Ms. Miller suffered no prejudice resulting from the Court's determination of the Defendants' counterclaims. Plaintiff litigated this case on Plaintiff's behalf, and at her

18

request. (N.T. 3/17/15 at 48). Furthermore, Plaintiff was represented by Ms. Miller's own attorney, Mr. Anthony Quinn. (N.T. 3/16/15 at 147). Thus, any interest Ms. Miller may have had in the disputed property was thoroughly defended by Plaintiff in the instant case and she suffered no prejudice by her decision to allow them to litigate the issue for her.

*IV. The Plaintiff's Ejectment Action*

The Plaintiff claims that the Court erred in concluding that Plaintiff failed to meet their burden in its ejectment action against the Defendants. When reviewing a trial court's decision in a quiet title or ejectment action, the court's findings need only be supported by competent evidence. *See Dellach*, 862 A.2d at 118; *Corbin v. Cowan*, 716 A.2d 614, 617 (Pa.Super.1998). The trial court's decision will not be reversed absent an error of law or capricious disregard of the evidence. *Corbin*, 716 A.2d at 617. In the instant case, this Court's conclusion that the 1854 Dickinson Deed conveyed an easement interest in the disputed property and that the Plaintiff's predecessor-in-interest had extinguished that easement in 1988 was well supported by the competent evidence introduced at trial. Thus, the Plaintiff's claim that this Court erred in its conclusions of law is without merit. *See Dellach*, 862 A.2d at 118; *Corbin*, 716 A.2d at 617.

A. The Court's Conclusion That the 1854 Dickinson Deed Conveyed a Railroad Right-of-Way/ Easement Interest in the Disputed Property Was Supported by Competent Evidence

In interpreting the 1854 Dickinson Deed, the Court's primary object is to ascertain and effectuate the intent of the parties at the time of transaction. *Mackall v. Fleegle*, 801 A.2d 577, 581 (Pa. Super 2002). The traditional rules of construction that guide the Court's determination of that intention are:

> (1) the nature and quantity of the interest conveyed must be ascertained from the instrument itself and cannot be orally shown in the absence of fraud,

19

accident or mistake and we seek to ascertain not what the parties may have intended by the language but what is the meaning of the words . . .; (2) effect must be given to all the language of the instrument and no part shall be rejected if it can be given a meaning . . .; (3) if a doubt arises concerning the interpretation of the instrument it will be resolved against the party who prepared it . . .; (4) unless contrary to the plain meaning of the instrument, an interpretation given it by the parties themselves will be favored . . .; (5) 'to ascertain the intention of the parties, the language of a deed should be interpreted in the light of the subject matter, the apparent object or purpose of the parties and the conditions existing when it was executed.'

*Id.*, citing *Lawson v. Simonsen*, 517 A.2d 155, 158 (Pa. 1980).

In deciding whether the 1854 Dickinson Deed created a railroad right-of-way/easement or a fee simple, this Court examined a number of factors that Pennsylvania courts have relied upon in making this determination. Factors which are indicative of an intent to convey a railroad right-of-way/easement rather than a fee interest include: (1) the lack of a warranty clause in the deed; (2) the recitation of specific rights granted to the railroad by the deed, such as the right to "use" the land for "construction, repair and use" because such language would be surplusage if the interest conveyed was a fee; and (3) the inclusion in the deed of a clause which releases the railroad from liability for damages resulting from the railroad's use of the land or rising from the location, construction and operation of the railroad.[5] *See Lawson*, 517 A.2d at 158; *Brookbank v. Benedum-Trees Oil Co.*, 131 A.2d 103, 110 (Pa. 1957); *see also Mackall v. Fleegle*, 801 A.2d 577, 582 (Pa. Super 2002) (discussing *Lawson* and *Brookbank*). Meanwhile, factors which are indicative of an intent to convey a fee rather an easement/right-of-way include: (1) the presence of a habendum clause in the deed, so long as interpreting the habendum clause to mean the

---

[5] This last factor is inapplicable here because the 1854 Dickinson Deed did not grant the railroad a release from liability. Of course, conveyances of an easement often do not release the grantee from liability. *See Stanton v. Lackawanna Energy Ltd.*, 886 A.2d 667, 677 (Pa. 2005) (noting that an "an easement holder is subject to the same liability as any other possessor of the premises" and detailing numerous cases where the easement holder was subject to liability resulting from the easement holder's use of the land.). As such, while *presence* of a release is indicative of intent, the *absence of a release* of liability in the document is not indicative one way or the other of the parties' intent to convey an easement/right-of-way or a fee.

20

parties conveyed a fee does not conflict with the parties intention as set forth in the granting clause; and (2) the use of the present tense of the words "grant, bargain, sell, release, and confirm" to convey an interest to the "grantee, his heirs, or assigns" because such language indicates that the grantor is engaging in a present transfer of her estate in fee, so long as other parts of the deed do not elucidate the intention of the parties to convey a lesser interest. *See Brookbank*, 131 A.2d at 159–61. Additionally, the amount of consideration paid for the interest is also indicative of the parties' intent where there is evidence of the value of the land at the time of the conveyance. *Id.* Under this factor, a large amount of consideration paid in comparison to the value of the land indicates an intent to convey a fee, and a small amount indicates an intent to convey an easement/right-of-way. *Lawson*, 417 A.2d at 159 (consideration of $1 in exchange for a strip of land 6 miles long and 66 feet wide was insufficient in 1881 to convey a fee interest).

In the instant case, considering these factors, the weight of the evidence supported the conclusion that the 1854 Dickinson Deed conveyed an easement/right-of-way. First, the 1854 Dickinson Deed contains no clause requiring Ms. Dickinson to warrant title. As in *Lawson, Brookbank*, and *Mackall*, the Court agrees that it is unlikely that North Pennsylvania Railroad intended to receive a fee interest from Ms. Dickinson without requiring such a clause. *Lawson*, 417 A.2d at 159; *Brookbank*, 131 A.2d at 110; *Mackall*, 801 A.2d at 582.

Second, the 1854 Dickinson Deed granting clause recites specific and limited rights granted to North Pennsylvania Railroad. The granting clause states that Ms. Dickinson "doth Grant Bargain Sell Release and Confirm unto the Said North Pennsylvania Railroad Company their Successors and assigns *the Exclusive use Right liberty and privilege of using occupying and Enjoying for Railroad purposes* All that Strip or piece of land [concerning the disputed property]

21

. . . which is to be taken as part of this indenture and *of keeping using and maintaining thereon the Rail Road of the Said party.*" (Plf. Exh 1); (Def. Exh 80). This language is not appreciably different than the language in the 1852 instrument conveying a railroad right-of-way discussed in *Quarry Office Park Assoc. v. Philadelphia Elec. Co.*, 576 A.2d 358, 362–63 (Pa. Super 1990)[6], and, as the *Brookbank* Court noted, would be mere "surplusage" if the parties intended to convey a fee interest. *Brookbank*, 131 A.2d at 110. Considering that the 1854 Dickinson Deed was drafted at or near the same time that the *Quarry* instrument was drafted, the words "*Exclusive use Right liberty and privilege of using occupying and Enjoying for Railroad purposes*" and "*keeping using and maintaining thereon the Rail Road of the Said party*" can therefore be given the effect and meaning that the parties intended to convey a railroad right-of-way/easement.

Third, while it is true that the 1854 Dickinson Deed contains a habendum clause, the presence of such a clause is not sufficient to find that that the parties intended to convey a fee. *See e.g., Moody v. Allegheny Valley Land Trust*, 976 A.2d 484, 491 (Pa. 2009) ("Fundamentally, the deed and its habendum clause create an easement to allow travel through the servient estates."); *Hassler v. Mummert*, 364 A.2d 402, 404 (Pa. Super 1976) ("It is the type of easement that by its very nature tends to be appurtenant, and the use of words of inheritance in the habendum and warranty clauses removes any doubt that it was intended to be so."). Moreover, the presence of a habendum clause is not necessarily indicative of the parties' intent when it conflicts with the granting clause. In *Fleck v. Universal-Cyclops Steel Corp.*, the Supreme Court held the interest conveyed was an easement/right-of-way even though the deed conveying the

---

[6] The 1852 instrument in *Quarry* stated that the grantor "by these presents do grant, bargain, sell, convey and confirm unto the said the Chester Valley Rail Road Company, their successors and assigns, the right, liberty, and privilege *of entering upon and occupying the land* belonging to me . . . and also the right of *using, occupying, and enjoying* the said land perpetually, for all the uses and purposes *convenient or necessary for a Rail Road.*" *Quarry*, 576 A.2d at 431–32 (emphasis added).

22

property to the railroad contained a habendum clause. 156 A.2d at 834 (Pa. 1959). In that case, the habendum clause in the deed contained the following language, "to have and to hold the said strip of land and the said rights and privileges and uses so long as the same be required for the uses and purposes of said railroad." Though the *Fleck* court recognized that such language "generally indicates a base fee [also known as a fee simple determinable], sometimes it is used in connection with a fee simple," and "sometimes it is used to describe an easement." *Id.*; *see* BLACK'S LAW DICTIONARY (10th Ed. 2014) (defining "base fee" as a fee simple determinable or "[a] fee that has some qualification connected to it and that terminates whenever the qualification terminates"). Importantly, according to *Fleck*, where the habendum clause conflicts with the granting clause in the deed, the granting clause prevails. *Fleck*, 15 A.2d at 652. As such, the presence of a habendum clause in the document is a *necessary, but not sufficient,* condition to find the parties intended to convey a fee.

In the instant case, the language in the habendum clause is entirely consistent with the intent expressed in the granting clause elucidating that Ms. Dickinson conveyed only a railroad right-of-way/easement. The habendum clause in the 1854 Dickinson Deed states that North Pennsylvania Railroad and its successors-in-interest "hold the Rights and premises aforesaid . . . forever *upon condition that*" that said company and its successors-in-interest "Shall make maintain keep and use" a railroad, "and if it shall happen that the Rail Road Contemplated . . . over the Said Described Strip or piece of Land . . . shall be removed or abandoned or . . . cease to be used for Rail Road Purposes then the Said Strip of land *shall revest*" in Ms. Dickinson, her heirs, and assigns "and she or they *"shall thereupon repossess* and enjoy the same premises as if this Present Indenture had never been made." (Def. Exh 80) (emphasis added). The operative language in the habendum clause is clear that if the land is "abandoned" or "cease[s] to be used

23

for Rail Road Purposes," then that land "shall revest" (*i.e.* give Ms. Dickinson and her heirs clear title, or "title *anew*"),[7] and that Ms. Dickinson and her heirs shall thereupon (*i.e.* "immediately") repossess (*i.e.* "regain possession of") the disputed property. Such operative language (upon abandonment of the property the grantor or her successors get new title and recommences her/their full possession of the land) is *identical* in effect and in kind to a common law abandonment of a railroad right-of-way/easement. *See Buffalo Tp. v. Jones*, 813 A.2d 659, 664, 664 (Pa. 2002) (holding that an abandonment of a right-of-way reverts the property interest to the grantor or the grantor's successors and that such a reversion is "the residue of an estate left to the grantor, *to commence in possession after the determination* of some particular estate granted out by him.") (internal citations and quotations omitted); *id.* at 664 n.6, quoting BLACK'S LAW DICTIONARY 405 (5th Ed. 1979) (Determination is defined as "[t]he ending or expiration of an estate or interest in property.").

Finally, the amount of stated consideration in the 1854 Dickinson Deed, $9,356.67, did not provide a reasonable basis for the Court to conclude that there was intent to convey a fee simple. The reason for this is because the Court was presented no evidence as to the value of the entire 9.35625 acres of land conveyed in 1854, meaning any such conclusion as to the parties' intent would be based solely on conjecture or surmise. *See Brookbank*, 131 A.2d at 159 ("In the absence of any evidence as to value of this strip of land in 1903, a finding that the consideration was inadequate for conveyance of a fee simple title would be based on conjecture and surmise. On this record the stated consideration is not reflective of the parties' intent.").

---

[7] *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "revest" as "To clothe or vest again or anew, as with rank, authority, or ownership <revesting the former owner with title>"); *id.* (defining "clear title" as a title "free from any encumbrances [such as an easement], burdens, or other limitations").

24

Thus, given the evidence presented at trial and the factors enumerated by Pennsylvania Superior Court, this Court did not err in holding that the 1854 Dickinson Deed conveyed a railroad right-of-way/easement.

B. The Court Did Not Err in Concluding that the Plaintiff's Predecessor-In-Interest, Conrail, Extinguished the Railroad Right-of-Way/Easement Over the Disputed Property

Plaintiff further disputes this Court's determination that Plaintiff's predecessor-in-interest, Conrail, extinguished its interest in the disputed property through abandonment. "When a railroad abandons an easement, the right-of-way is extinguished and the land is owned in fee simple by the owner or owners of the land on either side of the right-of-way." *Dellach*, 862 A.2d at 118. In order to find that a right-of-way has been abandoned, there must be a: (1) intent to abandon; and (2) external acts by which the intention is carried out. *Thompson v. Maryland & Penn. Railroad Preservation Soc.*, 612 A.2d 450, 453 (Pa. Super. 1992). Mere nonuse does not amount to abandonment. *Buffalo*, 813 A.2d at 665. Instead, the conduct of the Plaintiff or its predecessor Conrail "must have some *affirmative act* on his part which renders use of the easement impossible, or of some *physical obstruction* of it by him in a manner that is inconsistent with its further enjoyment. *Id.*, *quoting Thompson*, 612 A.2d at 453 (emphasis in original).

In the instant case, Conrail exhibited an intent to abandon the disputed property when it submitted an application for abandonment of the Bethlehem Branch to the ICC on May 18, 1984. (Plf. Exh 11); (Enright Tr. at 22, 84); *see Buffalo*, 813 A.2d at 665 ("The filing of a certificate of abandonment with the ICC or PUC demonstrate[s] intent to abandon."). Thereafter, Conrail took up the rails over the disputed property, rendering the rail completely out of service by 1988.

25

(Enright Tr. at 87–90). Conrail's intent to abandon was therefore also accompanied by external affirmative acts of physical obstruction that carried out its intention. Accordingly, in 1988, Conrail extinguished any interest it or its successors, including the Plaintiff, had in the disputed property, causing the Defendants' predecessors-in-title to own the property in fee simple. *DeNinno*, 862 A.2d at 118. The Plaintiff's ejectment action therefore fails because it did not prove by a preponderance of the evidence that it ever had a right to possess the disputed property or paramount title over the disputed property. *Billig v. Skvaria*, 853 A.2d 1042, 1049–50 (Pa. Super 2004).

### C. This Court Did Not Err In Concluding that the Plaintiff Failed to Meet Its Burden Permanent Injunctive Relief

"In order to establish a claim for a permanent injunction, the party must establish his or her clear right to relief." *Buffalo*, 813 A.2d at 660. The Court "may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Id.* In this case, for the reasons discussed above, the Plaintiff failed to establish its clear right to relief and thus its argument to the contrary is without merit.

## V. The Defendants' Counterclaims

### A. This Court Did Not Abuse Its Discretion in Permitting Defendants to Amend Their Counterclaims

The Court did not abuse its discretion in permitting the Defendants to amend their counterclaim during trial to assert a claim for ejectment as to a portion of the disputed property. Pennsylvania courts consistently hold that "amendments to pleadings are permitted at any time, including before, during, and after trial. *See, e.g., Horowitz v. Universal Underwriters Ins.*, 580 A.2d 395, 398 (Pa. Super. 1990); *Winterhalter v. West Penn Power Co.*, 512 A.2d 1187, 1189

26

(Pa. Super. 1986) ("Courts have allowed amendments at any time, as provided by the specific language of this statute.); *Biglan v. Biglan*, 479 A.2d 1021, 1025 ("As can be seen from the clear language of this rule, no limit is imposed on the time when an amendment may be made."). The fundamental purpose of this rule is to prevent cases from turning on purely technical defects. *Biglan*, 479 A.2d at 1025. In *Sutton v. Miller*, the Pennsylvania Superior Court allowed an amendment from a quiet title action to an ejectment action after the appeal, because the change was "mere formalism." 592 A.2d 83, 86–87 (Pa. Super. 1991).

In the instant case, the granting of an amendment was proper because Plaintiff was not prejudiced. Whether framed as an action to quiet title or for ejectment, Plaintiff was on notice that Defendant sought to prove title to the disputed property. Thus, Plaintiff had sufficient information as to prepare for trial, given the strong similarity between the two causes of action. *See id.* (describing the similarity between actions to quiet title and ejectment). The only effect this amendment had on the case was to prevent it from turning on a mere technical issue because the Plaintiff's privies happened to be in possession of a portion of the disputed property, making ejectment the proper cause of action. *See Biglan*, 479 A.2d at 1025. Thus, the Court did not abuse its discretion in allowing for an amendment of the Defendants' counterclaim, even on the third day of trial, where such amendment had no effect on Plaintiff's trial strategy and merely prevented the case from turning on a formalistic technical issue. *See Sutton*, 592 A.2d at 87.

B. The Defendants' Counterclaims Were Not Barred By The Statute of Limitations

Plaintiff claims that the Defendants' counterclaims should have been defeated by the running of the statute of limitations set by 42 Pa.C.S.A. § 5530. However, § 5530 governs the statute of limitations governing the acquisition of title. *Tioga Coal Co. v. Supermarkets Gen. Corp.*, 433 A.2d 483, 489 (Pa. Super. 1981). Thus, to avail themselves of §5530, a party must also make out

27

the elements of their acquisition of the title. *See id.* In making out a claim for adverse possession, a party must show an: (1) actual, (2) visible, (3) notorious, (4) exclusive and distinct, (5) hostile, and (6) continuous use (7) for twenty-one years. *Dunlap v. Larkin*, 493 A.2d 750, 756 (Pa. Super. 1985). In order to make out a claim for an easement, a party must prove that, for a period of 21 years, the use of the property was all of the following: (1) adverse; (2) open; (3) notorious; and (4) continuous and uninterrupted. *Odette's, Inc. v. Com., Dep't of Conservation & Nat. Res., Bureau of State Parks*, 699 A.2d 775, 784 (Cmwlth 1997).

In the instant case, Plaintiffs did not even attempt to make an argument that they had cut off the Defendants' ownership of the property through an adverse means of title acquisition. In fact, the Defendants produced evidence to the contrary when Defendant Giunup testified that the Defendants, rather than the Plaintiff, had been in continuous use of the property since they purchased it in 2004. (N.T. 3/15/15 at 117–18). Thus, the Plaintiff's argument that the Defendants' counterclaim fails due to the statute of limitations is without merit.

## D. CONCLUSION

For the foregoing reasons, the decision of this Court should be affirmed.

BY THE COURT:

Dated: May 13, 2016

DENIS P. COHEN, J.

28